GENERAL BONDING & CASUALTY INS. CO. et al. v. MOUNT.   (No. 921.)*

(Court of Civil Appeals of Texas.   Amarillo. Feb. 9, 1916.   On Motion for Rehearing, March 8, 1916.)

CORPORATIONS ☞80—STOCK SUBSCRIPTION— MISREPRESENTATIONS—RESCISSION.

Agents for a partnership, which was organizing a corporation, falsely represented to plaintiff that the corporation proposed to be organized would receive his note for his subscription and extend it for an indefinite time, notwithstanding they had no such authority and the corporation could not validly receive a note in payment of stock. Held that, despite the ordinary rule that a promise to perform an act in the future, made as a representation to induce another to enter into a contract, will not amount to a fraud in legal contemplation, though the promise be broken without excuse, such false representations warranted plaintiff in rescinding his subscription, for the agent must have known neither he nor his principal would be bound or could perform.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 244, 246–264, 1407, 1407½; Dec. Dig. ☞80.]

Error from District Court, Deaf Smith County; D. B. Hill, Judge.

Action by R. N. Mount against the General Bonding & Casualty Insurance Company and another. There was a judgment for plaintiff, and defendants bring error. Affirmed.

Locke & Locke, of Dallas, and Knight & Slaton, of Hereford, for plaintiffs in error. W. H. Russell and Gilliland & Estes, all of Hereford, for defendant in error.

HUFF, C. J. This was an action, brought by defendant in error, Mount, against the General Bonding & Casualty Insurance Company and the Texas Surety & Casualty Organization Company. The cause of action was based on alleged fraudulent representations by Bell & Wright, agents for the Organization Company, in procuring a certain contract for stock in the proposed General Casualty Insurance Company. The Casualty Insurance Company was made a party alone for the purpose of canceling the contract so procured, and a judgment was asked for the sum of money paid to the Organization Company for its services performed and to be performed in the organization of the Casualty Company, which sum was $500 and interest thereon. The General Casualty Company disclaimed any interest in the contract, and the Organization Company, which was a partnership, setting out the partners, denied the fraud, etc. The trial court rendered judgment canceling the contract for stock in the proposed Casualty Insurance Company, and rendered a judgment against the Organization Company for the amount of money paid to it to organize the proposed corporation.

By the written contract, the defendant in error agreed to take 10 shares of the capital stock of the proposed company, of the par value of $100 each, and pay therefor the sum of $1,500, which was to pay for the capital stock and 12½ per cent. to surplus, and in addition $500 to the promoters. The defendant in error, Mount, testified:

"As to who solicited my subscription to the contract, will say the conversation I had was with Mr. Wright altogether. I did not have any talk with Mr. Bell. He came in about the wind-up of it. He didn't hear practically any. As to what was said between me and Mr. Wright with reference to any person or persons advancing or lending me money to pay for this stock, will say we had a right smart conversation about it, maybe two or three or four hours, and he went ahead and said that $500 was all I had to pay on it. Give him a note for $500, and he said he wouldn't send the note on in, but would hold that. He said: 'They will take your note for $1,500, and charge you 7 per cent. interest, and you can put up your stock for collateral.' He said they were going to organize a new company, and he said: 'If the new company won't carry it, the old one will. That is all you will have to put up, for five years at least.' Mr. Wright told me that this former company, the one that was organized, would advance the money to pay for this stock, and take my note in case the new company would not. Yes; it was the Organization Company, the one Bell & Wright were representing at that time. They were going to organize under a new name. He said: 'If the new company won't take it, and carry it, the old company will.' I asked him if he would do that, and he said: 'Yes; I heard Mr. Stephens make that proposition to Taylor yesterday, and I have the same authority he has.'"

He further testified:

"No, sir; I would not have entered into this subscription contract if Mr. Wright had not made these promises or statements to me. These promises that were made induced me to enter into the contract. I told him plainly I did not want to put any money into it, and he said: 'You won't have to put only this $500.' He said the Organization Company would carry for five years anyway. He said this Organization Company would carry it, provided the new company did not take it. He said he had heard the conversation between Stephens and Taylor, and he said: 'I have the same authority he has.' As to his statement with reference to his au-

thority to make this kind of agreement, will say he said he was agent for the company and that anything he said would stand up."

The facts show that the Organization Company was composed of several members, who were acting as a partnership in the organization of the proposed Casualty Company, and that Bell & Wright had a contract with the Organization Company as soliciting agents. The contract in this case shows that Bell & Wright had no authority to make the agreement to take notes of the subscribers for stock in the proposed company, with 7 per cent. interest, secured by the stock in the company.

Wright testified:

"I had no authority from the Texas Surety & Casualty Organization Company to make arrangements for the extension of the time of deferred payments. In cases of irregular subscriptions, we made it a rule (I mean, Mr. Bell and myself made it a rule) to submit the agreements proposed to the company in writing for their approval. We had no authority to take regular subscriptions without referring them to the company for their approval and acceptance, and we never did make any regular subscription agreement without referring the same to the company for their approval and acceptance. No statement, promise, or condition regarding an extension of the majority of the deferred payments on the amount of subscription was embraced in writing or reported to the Texas Surety & Casualty Organization Company by me, or within my knowledge by Mr. Bell. I never made any. The subscription was regular and I did not deem it necessary. No statement, promise, or condition regarding extension of the maturity of the deferred payments was made a part of the contract or agreement of sale. If any statement was made at the time regarding any extension, it was merely that Mr. Mount might be able to obtain such extension through the company, as such extension had been granted in the case of Dr. Taylor. I do not remember any such statements being made at the time, however, by either Mr. Bell or myself."

The evidence shows that the subscription contract was upon the regular form prescribed by the Organization Company and furnished Bell & Wright, as soliciting agents, to be used by them. The $500 note, executed at the time of executing the subscription contract, was a short time note and thereafter paid by Mount. The Organization Company and the General Casualty Insurance Company refused to recognize the representations of Wright, claimed to have been made by Mount, and refused to extend the note on the kind of paper that Mount contends was represented he could make, and this suit was instituted thereafter. The case was tried before the court without a jury, and the case is here alone on a statement of facts, without conclusions of fact, filed by the trial court.

The first assignment is that "the court erred in not rendering judgment for the defendants" (plaintiffs in error). The propositions presented under this assignment are:

First. "Representations or promises which relate to the future, and refer to no past or existing fact, will not justify rescission of a contract, or support an action for deceit, even though subsequently such representation or promise is not made good, unless it be shown that at the time such representation was made the party making the same entertained a fraudulent intention not to perform, and made the same with the design of fraudulently procuring the other party to enter into the contract."

Second. "There was no evidence that at the time the alleged representation was made there existed an intention not to perform the same, or that it was made in bad faith for the purpose of cheating or defrauding the plaintiff."

Assignments from 2 to 9, inclusive, raise the question presented in the above propositions; in fact, plaintiff in error refers to the propositions, statements, authorities, and arguments under the first assignment, and in a short argument under each of the assignments states:

"The foregoing assignment involves a consideration of the same questions discussed under the first and second propositions under the first assignment of error."

It will be perceived we are not called upon to determine whether the representations relied on in this case constitute a part of the contract and were omitted from the writing, and whether, if so, it contradicts the writing. The only question, therefore, is: Does the evidence in this case warrant the finding of fraud in making such representations, to induce the contract? The facts in this case show that Wright had no authority to make such representation, and that he then knew he had no such right, and also knew that the proposed corporation could not legally give the defendant in error such a privilege as he represented would be granted, and, thus knowing, he made the representations testified to by Mount. These representations were made to induce the contract and by reason of which he secured the contract. His statement that he had such authority was a statement of a then purported existent fact, which in fact was untrue, and it was calculated to deceive and did deceive. We believe the trial court was justified in finding from the facts that the representations were fraudulently made to induce the contract, and hence correctly canceled the subscription contract and decreed a recovery for the money so obtained. The facts shown in this case were offered, and doubtless accepted by the court, to establish that there was no contract executed by reason of the false statements made, and that by reason thereof the defendant in error was induced to sign the contract. Commonwealth, etc., v. Bomar, 169 S. W. 1060; U. S. Gypsum Co. v. Shields, 106 S. W. 725. We recognize the rule to be ordinarily that a promise to perform an act in the future, although made as a representation to induce the other to enter into a contract, will not amount to fraud in legal contemplation, although afterwards the promise, without any excuse, is broken; but if the promise was made with the design of cheating or deceiving the party sought to be bound by the contract, and the one so representing had no intention of performing, or knew that his principal or himself would not perform or

be found thereby, this fact, coupled with the further fact that the contract was so obtained, and the refusal of a promisor to perform, will be sufficient to rescind the contract. Railway Co. v. Titterington, 84 Tex. 218, 19 S. W. 472, 31 Am. St. Rep. 39; Railway Co. v. Smith, 98 Tex. 553, 86 S. W. 322; Touchstone v. Staggs, 39 S. W. 189; Collinson v. Jefferies, 21 Tex. Civ. App. 653, 54 S. W. 28; Davis v. Driscoll, 22 Tex. Civ. App. 14, 54 S. W. 43. The case as presented in this court by the plaintiff in error we do not think shows reversible error.

The judgment of the trial court will be affirmed.

### On Motion for Rehearing.

The appellants, upon motion for rehearing, insist that the statement of facts does not show that Wright represented he had the power to make the promise as alleged and testified to by Mount, because the court, in qualifying the bill of exceptions excluded the testimony for any purpose. The witness testified substantially to the same statement twice, to which the appellant·took two bills of exception. The bills are preserved in the statement of facts, and at page 2 the first testimony was given and the bill of exceptions taken thereto. The objection is that agency could not be established by the declarations of the agent. The trial court, in his explanation, says the testimony was not considered to prove agency—

"but was considered admissible as tending to prove that said agent assumed to act in the matter complained of, as defendant's agent, and in connection with other testimony, to the effect that the money obtained from plaintiff was accepted by defendants and withheld by them, with full knowledge of the means used by said agents to induce plaintiff to pay the money to them; also said testimony was considered admissible to show the inducement that led plaintiff to enter into the contract and pay the $500.-00, and give notes to same."

On page 3 the witness testified that Wright said—

"he had heard a conversation between Stephens and Taylor, and he said, 'I have the same authority as he has.' As to this statement, with reference to his authority to make this kind of agreement, will say he said he was agent for the company and that anything he said would stand up."

The trial court qualified the bill to this evidence that the statement of Mount "to the effect that Wright said he had the same authority as Stevenson," was withdrawn by plaintiff and "was not considered by the court for any purpose." It will be seen the court did not exclude the representations of Wright that he had authority, or that what he said "would stand up," but only excluded a comparison of authority with Stephens. This we did not think, and do not now believe, affected in the least the representations made upon which we based our opinion. Wright evidently knew as a matter of law he could not bind the corporation not yet in

existence, and knew that it could not issue shares of stock for a note.

The motion for rehearing will be overruled.